UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELIZABETH NELSON,

                    Plaintiff,

v.

I.Q. DATA INTERNATIONAL,
INC.,

                    Defendant.

Case No. 22-12710
Honorable F. Kay Behm
Magistrate Judge Elizabeth A. Stafford

---

### REPORT AND RECOMMENDATION TO GRANT
### PLAINTIFF'S MOTION FOR SANCTIONS
### (ECF NO. 56)

---

## I.    Introduction

Plaintiff Elizabeth Nelson sues I.Q. Data International, Inc., on behalf

of herself and a putative class, alleging violations of the Fair Debt

Collection Practices Act (FDCPA), 15 U.S.C. § 1692, *et seq*., and the

Michigan Occupational Code, Mich. Comp. Laws § 339.915, *et seq*.  ECF

No. 1.  I.Q. Data collects debt for the apartment industry.  *Id.,* ¶ 13.  Nelson

claims that I.Q. Data has tried "to collect interest not provided for in the

underlying creditor-debtor contract, instrument, or under state law."  *Id*.

She also alleges that, after she disputed the debt in writing, I.Q. Data failed

to exercise due care and tried to collect debt that she did not owe. *Id.*, ¶¶ 5-6.

Nelson seeks to represent a class of persons who received a letter from I.Q. Data stating that their "outstanding principal balance will accrue interest at a rate of 005.00 per annum" and whose contract with the original creditor did not expressly include a 5% yearly rate of interest. *Id.*, ¶ 156. Nelson's putative subclass includes the members of the class who "at any time either made a payment above the amount of the 'Principal Due' claimed by I.Q., disputed the debt in writing or requested verification of the debt in writing." *Id*.

The Honorable F. Kay Behm referred this case to the undersigned for discovery matters. ECF No. 25. After months of I.Q. Data flouting orders to compel discovery, Nelson moves this Court to impose dispositive sanctions. ECF No. 56. The Court held a hearing on December 14, 2024, and now recommends that Nelson's motion be granted.

## II.    Background

For efficiency, this section will detail both the factual background of Nelson's and the Court's combined efforts to prompt I.Q. Data's compliance with discovery rules and orders, and the Court's contemporaneous conclusions of law.

### A. November 2023 to May 2024

Signs that I.Q. Data regarded its participation in discovery as voluntary were evident early on. In November 2023, after a scheduling conference, Judge Behm entered a case management order with a July 2024 discovery cutoff. ECF No. 23. Two days after Judge Behm entered the case management order, Nelson served I.Q. Data with discovery requests. ECF No. 30, p. 5. [1] But in emails exchanged between Paul Gamboa (attorney for I.Q. Data) and Curtis Warner (attorney for Nelson), Gamboa announced, "[W]e will be resisting full blown discovery until hearing on the motion to dismiss." ECF No. 30-6.

I.Q. Data could have moved for a protective order or stay to resist full-blown discovery. But it instead opted to make boilerplate objections to every interrogatory, request for production of documents, and request for admissions. ECF No. 30-2; ECF No. 30-3; ECF No. 30-4. One of I.Q. Data's objections to the requested discovery was that, "in light of the hearing held on November 16, 2023, it is not proportional to the current needs of the case." *Id*. But November 16 was the date of the scheduling conference; the docket shows no hearing on that date. And "[i]t is also well

---

[1] Most documents filed by Nelson include no header, reportedly because of the software used to convert the documents to PDF. So the Court cannot cite PageID numbers for those documents.

3

established that the filing of a motion to dismiss does not automatically warrant a stay of discovery." *AFT Michigan v. Project Veritas*, 294 F. Supp. 3d 693, 694 (E.D. Mich. 2018).

Nelson thus moved for an order to show cause, to compel, and for sanctions. ECF No. 30. After an April 10, 2024 hearing, the Court granted Nelson's motion, ordering I.Q. Data to "provide complete responses to plaintiff's discovery requests," and to pay sanctions to Nelson under Federal Rule of Civil Procedures 37(a)(5). ECF No. 37. I.Q. Data had to "provide complete responses" because, as Nelson had noted in her motion, "'Boilerplate objections are legally meaningless and amount to a waiver of an objection.'" ECF No. 30, p. 10 (quoting *Siser N. Am., Inc. v. Herika G. Inc.*, 325 F.R.D. 200, 209-10 (E.D. Mich. 2018)). And I.Q. Data forfeited the chance to make proper objections by not doing so within the 30-day period for objecting to the discovery requests. *Siser*, 325 F.R.D. at 201; Fed. R. Civ. P. 33, 34, 36.

### B. May to July 2024

Rather than fully responding to Nelson's discovery requests, I.Q. Data served new objections on May 1, 2024 that were both boilerplate and lacked merit. ECF No. 42-2; ECF No. 42-3; ECF No. 42-4; ECF No. 42-5. On top of the usual assortment of meaningless claims that discovery

4

requests were "irrelevant, vague, overbroad and not proportional to the needs of the case," I.Q. Data asserted attorney-client, insurer-insured, and attorney work product privileges, but included no privilege log as required by Federal Rule of Civil Procedure 26(b)(5)(A)(ii). ECF No. 42-3; ECF No. 42-4, PageID.477; ECF No. 42-5, PageID.487; ECF No. 42-6 (letter from Warner stating that "no privilege log was produced").

I.Q. Data also objected to requests "to the extent" that they sought "production of information that is confidential and/or proprietary, or otherwise constitutes a trade secret." ECF No. 42-3, PageID.467. But I.Q. had no right to withhold confidential or proprietary information from discovery. Rather, the remedy for protecting confidential or proprietary information is to seek a protective order under Rule 26(c). *See, e.g.*, *Glob. Tech., Inc. v. Ningbo Swell Indus., Co., LTD*., No. 2:19-CV-10934, 2020 WL 12656241, at *2 (E.D. Mich. Aug. 14, 2020), *objections overruled*, 2020 WL 12656342 (E.D. Mich. Sept. 25, 2020). As the Court already noted, I.Q. Data made no timely motion for protective order. *Nelson v. I.Q. Data Int'l, Inc*., No. 22-12710, 2024 WL 3448466, at *1 (E.D. Mich. July 16, 2024) ("Although Rule 26(c)(1) has no explicit deadline, most courts require motions for protective orders to be filed before discovery responses are due. At the very latest, a motion for protective order must be made by the

5

deadline for responding to a motion to compel.") (cleaned up).  And the Court sees no evidence that I.Q. Data sought to negotiate with Nelson to enter a protective order at that time.

I.Q. Data did produce about 100 documents on May 1, but it did so "[s]ubject to and without waiving said objections."  ECF No. 42-3.  This was improper.  "[A] party cannot cloak its answers in without-waiving objections."  *Aprile Horse Transp., Inc. v. Prestige Delivery Sys., Inc.*, No. 5:13-CV-15-GNS-LLK, 2015 WL 4068457, at *3 (W.D. Ky. July 2, 2015).  In other words, "[a] party either objects to production or produces.  If it produces, the objections are generally deemed waived."  *Riley v. NewPenn Kilt, LLC*, No. 518CV00014TBRHBB, 2020 WL 59838, at *2 n.1 (W.D. Ky. Jan. 6, 2020).  And I.Q. Data failed to indicate whether it withheld documents based on its objections.  "An objection must state whether any responsive materials are being withheld on the basis of that objection."  Fed. R. Civ. P. 34(b)(2)(C); *see also Siser*, 325 F.R.D. at 203 ("[D]efendants fail to state whether responsive material was withheld as a result of their objections.").

Another of I.Q. Data's repeated objections was that requests were not proportional to the needs of the case because answering would "entail a file-by-file" review.  ECF No. 42-2; ECF No. 42-3; ECF No. 42-4.  I.Q. Data

6

thus suggested that a file-by-file review would be burdensome, but it offered no evidence or explanation of what a file-by-file search would require. According to I.Q. Data's website, it has "cutting edge technology,"[2] so one would assume that it has advanced electronic data management and search capabilities. I.Q.'s failure to justify its refusal to perform file-by-file searches would defeat even a timely objection to the burden, as "[a] party objecting to a request for production of documents as burdensome must support that objection with affidavits, other evidence, or enough information to allow the Court to make a common-sense judgment." *Nelson v. I.Q. Data Int'l, Inc.*, No. 22-12710, 2024 WL 2963790, at *1 (E.D. Mich. June 12, 2024).

On May 2, 2024, Warner sent a letter by email to Gamboa and Luke Wolf, another I.Q. Data attorney, noting that the Court had ordered I.Q Data to fully respond to the discovery because its boilerplate objections amounted to a waiver of all objections. ECF No. 42-6. Warner demanded to meet and confer with I.Q. Data's counsel within the next few days. *Id*. He concluded, "Given the prior lack of response to conducting a rule 37 meet and confer, and other requests to confer, if we are not promptly

---

[2] *See* I.Q. Data's website, https://www.data-inc.com/about-us (last visited on January 15, 2025).

provided a time and date, we will contact Magistrate Judge Stafford's clerk to request permission for leave to file our motion to compel, show cause and for sanctions." *Id*.

After not hearing from I.Q. Data's attorneys, Nelson's counsel asked the Court for leave to file another motion about the deficiencies in I.Q. Data's discovery responses, which the Court granted by text-order on May 7, 2024. Minutes after the Court entered its text-order, Gamboa emailed Warner stating that he saw the text-order and that he hoped to chat with Warner "with the hopes of limiting the scope of the dispute." ECF No. 42, p. 2; ECF No. 47-3, PageID.536. But Nelson believed that I.Q. Data's effort to meet and confer was "simply too late" and filed its motion. *Id.*, p. 3.

Citing I.Q. Data's violations of the April 10 order requiring it to "provide complete responses to plaintiff's discovery requests," Nelson requested that the Court impose monetary and other sanctions, "including a class default judgment being entered against Defendant, alternatively Defendant's affirmative defenses be struck and that its [sic] prohibited from supporting or opposing designated defenses, or from introducing designated matters in evidence, and Requests for Admission Nos. 11-22, should be deemed as admitted." ECF No. 37, PageID.382; ECF No. 42, p. 20.

8

I.Q. Data claimed in response that it "[c]omplied with this Court's order in full." ECF No. 46, PageID.506. Emphasizing the federal rules' aim for proportional discovery, I.Q. Data offered its unilateral opinion that it produced "every piece of information needed to advance this case forward." *Id.*, PageID.514. This Court shares the aim for cost-effective, proportional discovery. *See Weidman v. Ford Motor Co.*, No. CV 18-12719, 2021 WL 2349400, at *3 (E.D. Mich. June 9, 2021) (emphasizing that Rule 26(b)(1)'s requirement for proportionality is intended "to rein in the exorbitant costs, protracted time, and contention that have strained the civil justice system"). At the same time, the Court has long warned that it "does not tolerate a party unilaterally and unreasonably deciding that requested discovery is not relevant or discoverable under proportionality based solely on its own litigation position." *Nelson*, 2024 WL 2963790, at *2; *Tchun v. 3M Co.*, No. 20-CV-12816, 2021 WL 5864016, at *2 (E.D. Mich. Oct. 18, 2021); *Keel v. Wacker Chem. Corp., LLC*, No. CV 20-10085, 2020 WL 12688177, at *2 (E.D. Mich. Nov. 10, 2020). And the pursuit of cost-effective and proportional discovery does not give a party license to disregard the discovery rules or court orders.

Thus, after a hearing on June 12, 2024, the Court granted in part Nelson's second motion to show cause, finding that I.Q. Data "violated the

9

April 10 order and that defendant's objections to fully answer the discovery requests are **WAIVED**." *Nelson*, 2024 WL 2963790 at *1 (emphasis in original). The Court ordered I.Q. Data to pay Nelson's attorney's fees and costs, but it gave I.Q. Data another chance to cure its deficiencies and "defer[red] a decision about whether to order or recommend more severe sanctions until after the parties have met and conferred in **person or by video** to address the deficiencies in defendant's discovery responses." *Id.* (emphasis in original). The Court also ordered the parties to file supplemental briefs about I.Q. Data's remaining discovery deficiencies, scheduled a hearing for July 9, 2024, and warned I.Q. Data "**that further violations of the rules of discovery or court orders will result in more sanctions that may include the entry of a default judgment against defendant**." *Id*. (emphasis in original).

Between the June hearing and the filing of supplemental briefs, Judge Behm held a hearing on I.Q. Data's motion for judgment on the pleadings, in which it argued that it had the right to charge 5% interest under Michigan's usury statute. ECF No. 36. In her June 16, 2024 minute entry, Judge Behm "took the matter under advisement" and said that she would "issue a written opinion after the Magistrate Judge issues an order on the discovery disputes." This entry ended any question about whether

I.Q. Data could avoid discovery pending Judge Behm's decision on whether it had a right to charge interest.

Nelson's supplemental brief, filed later in June, included a long list of deficiencies in I.Q. Data's discovery responses. ECF No. 50. She said that I.Q. Data had not answered Interrogatories Nos. 1-5, 8-12, or 14-17; that I.Q. Data's full responses to requests for production of documents (RFPs) Nos. 1 and 6-19 were still outstanding and that it provided no privilege log for withheld documents; that I.Q. Data's responses to RFPs Nos. 2-6 included a remark that "Investigation Continues"; and that I.Q. Data neither admitted nor denied requests for admissions Nos. 11-18 and made improper objections. *Id.* The interrogatories asked various questions about the number of Michigan residents I.Q. Data mailed letters to indicating that their outstanding balance would accrue interest of 5%, along with the identities and addresses of those residents. *Id.* I.Q. Data was asked to identify the existence of relevant contracts and the people who drafted the letters to the putative class members. *Id.* And Nelson asked I.Q. Data about its net worth. *Id.*

Nelson alleged that I.Q. Data produced neither its contract or written communications with the original creditor who claimed that Nelson owed the debt nor evidence that I.Q. Data had an interest in the debt Nelson

11

allegedly owed.  ECF No. 50.  I.Q. Data had produced no documents with legal analysis supporting its charge of interest on outstanding debt; no templates of its collection letters; no documents related to earlier actions against I.Q. Data related to its charging of interest on unpaid balances; and no documents about I.Q. Data's net worth.  *Id.*  And I.Q. Data had still failed to identify in its initial disclosures the names and contact information of its witnesses with knowledges of its defenses, as required by Rule 26(a)(1)(A)(i).  *Id.*

I.Q. Data responded to Nelson's second motion that the parties had engaged in meaningful discussions about the discovery issues and that it had made supplemental responses.  ECF No. 52.  To allow the parties to narrow the issues the Court would have to consider, I.Q. Data requested that the July 9 hearing be adjourned.  *Id.*  The Court thus rescheduled the hearing for July 16, 2024.

After the July 16 hearing, the Court granted Nelson's motion for sanctions, ordering I.Q. Data to pay attorney's fees of $7,830 under Rule 37(b)(2), and

- By August 30, 2024, defendant must provide (1) the names and addresses of the putative class members and (2) discovery about its net worth, as requested in Nelson's Interrogatory 14 and Requests for Production 12-14.

12

- Besides the responsive discovery ordered above, defendant may not without leave of court and for good cause shown rely on any other documentary evidence beyond Bates No. 107.

*Nelson*, 2024 WL 3448466 at *1. As noted, the Court found that I.Q. Data's request for protective relief under Rule 26(c)(1) was made too late. *Id*. The order concluded, "**The Court warns defendant that continued violations of the rules of discovery or court orders will result in more severe sanctions, up to and including the entry of a default judgment against defendant**." *Id.* (emphasis in original).

### C. July to September 2024

The day before the July 16 status conference and in the days after that conference, Warner wrote to Gamboa about Interrogatory No. 6. ECF No. 58-2, PageID.953-960. In that interrogatory, Nelson requested that I.Q. Data state the number of putative subclass members who "disputed **the debt** in writing," along with those members' names and last known addresses. ECF No. 56, p. 6 (emphasis added). On top of boilerplate objections about the breadth and proportionality entailed by a "file-by-file review," I.Q. Data denied that any consumer had "disputed, in writing, IQ Data's authority to **collect interest**." ECF No. 58-2, PageID.960 (emphasis added). In his emails, Warner said that I.Q. Data's response to Interrogatory No. 6 was nonresponsive to the question about who disputed

13

the debt.  *Id*., PageID.953, 956, 959-960.  In early August, Warner informed Gamboa that he had reached out to the Court to address Interrogatory No. 6:

> I have not had a response to my July 23, 2024 email following up our conversation seeking a concurrence in motion to compel Interrogatory No. 6, which goes to the identification of the putative subclass.  As we discussed IQ did not respond to the substance of the Interrogatory.  This was raised with the Court in oral arguments on the second motion to compel, but was inadvertently omitted in the motion itself.
>
> Given that I have not had any response, and allowing ample time for you to confer with IQ, I reached out [to] the Court's case manager this morning to schedule a conference with the Court to discuss filing a motion to compel Interrogatory No. 6.

*Id*., PageID.952.  Warner asked Gamboa to respond with his availability on three dates the Court had provided for a status conference.  *Id*.

Gamboa responded three days later, on August 5, 2024, stating that he was stretched thin and would respond within a few days.  *Id*., PageID.581.  But in line with his custom and practice, Gamboa did not respond to Warner.  So on Friday, August 16, 2024, Warner emailed the Court's case manager asking for a status conference because he had not heard from Gamboa since August 5.  *Id*., PageID.950-951.  Warner emailed the Court again the next Monday, emphasizing that he could not reach Gamboa or Wolf, and asking permission to file move to compel an answer to Interrogatory No. 6.  *Id*., PageID.950.

14

The Court thus held another status conference on August 21, 2024. As confirmed in the Court's notes, the parties discussed Interrogatory No. 6, with Gamboa protesting that I.Q. Data would need to perform a file-by-file review of over 3,000 electronic accounts to look for attached PDF documents.  Warner questioned why I.Q. Data would not have a code for records, like other debt collections systems, that would allow I.Q. Data to easily search for accounts with a written dispute of the debt.  I.Q. Data had in fact submitted no evidence that it could not conduct such a search with relative ease using its "cutting edge technology." [3]  The Court and parties thus agreed that Warner could question I.Q. Data's deposition witness under Federal Rule of Civil Procedure 30(b)(6) before September 23, 2024, the next status conference date.  The Court emphasized that, although I.Q. Data had waived any objection about the burden of searching its files, the parties could explore ways to minimize the burden.  And the Court warned Gamboa that sanctions would be more significant if violations continued.

Emails between Warner and Gamboa confirm that I.Q. Data provided the putative class lists at the end of August 2024, but that cities were omitted from the addresses.  ECF No. 57-1, PageID.935-937.  And

---

[3] *See* I.Q. Data's website, https://www.data-inc.com/about-us (last visited on January 15, 2025).

15

claiming that I.Q. Data had "real concerns" about disclosing its net worth, Gamboa said that Nelson either had to agree to a confidentiality order or that I.Q. Data would stipulate to the statutory maximum of $500,000 to "take the net worth issue out of contention." *Id*.

Warner responded that the class list failed to identify the city of each class member, and that it did not identify under which count each putative class member would fall. *Id*., PageID.936-937. Nor did I.Q. Data identify the subclass of consumers who disputed their debt in writing. *Id*. Warner was also still waiting for Gamboa to provide a date for its witnesses' depositions. *Id*.

Gamboa provided no substantive responses to Warner for more than two weeks and not until the day before the September 23 status conference. In Gamboa's email, he said that he had re-run the class lists in a way that identified which consumers belonged to the putative classes under Counts I and II, respectively. *Id*., PageID.935. But in response to Warner's demand for a subclass list of the consumers who disputed their debt in writing, as requested in Interrogatory No. 6, Gamboa wrote that I.Q. Data "do[es] not have that information." *Id*. And despite the intention for the Rule 30(b)(6) deposition to be complete by the September 23 status conference, Gamboa now proposed a date in late October. *Id*.

16

### D. Current Motion to Compel and for Sanctions

The Court learned at the September 23 status conference that the parties had made no progress and were still arguing about the same issues. The Court thus granted Nelson's request to again move to compel discovery and scheduled a hearing for October 25, 2024. ECF No. 55. In its new motion, Nelson highlighted Interrogatory Nos. 6 and 7, and RFPs 12 to 14. ECF No. 56.

Nelson submitted an apparently computer-generated "Print Debtor Work Card" showing that Nelson had disputed her debt in writing, causing a change in status from "PNC to CHL."

```
09/03/21 13:53 WFB Sts Chg:PNC To CHL              Y  025 10/09           CHL
09/03/21 13:53 WFB COMPLIANCE DEPT REVIEW          N  025 10/09           CHL
         THE COMPLIANCE DEPARTMENT HAS REVIEWED THIS FILE
         RCVD LTR OF DIS FROM Z REQUESTING VALIDATION OF  THE DEBT STATING
         THAT THEY DO NOT OWE THIS DEBT. LOOKING AT THE ACCOUNT IT LOOKS LIKE Z
         OWES FOR RENT SENDING COMMUNICATION TO THE PROPERTY FOR VALIDATION
         DOCS
         RECEIVED DISPUTE LETTER WITHIN VALIDATION PERIOD. ACCOUNT ON HOLD
         UNTIL ADDITIONAL INFORMATION IS RECEIVED.
```

ECF No. 56-2, PageID.896. Nelson believed that status change to CHL was I.Q. Data's way of indicating that she was challenging her debt. ECF No. 56, pp. 8-9. Nelson also noted that I.Q. Data voluntarily disclosed in a Western District of Texas case its January 2018 Consumer Dispute Policy for investigating disputes submitted to it within its validation period. *Id.*; ECF No. 56-3; *Reed v. I.Q. Data Int'l, Inc.*, No. SA-22-CV-00068-FB, 2023 WL 5246356, at *1 (W.D. Tex. Aug. 14, 2023), *adopted*, No. CV SA-22-CA-

17

68-FB, 2023 WL 5814388 (W.D. Tex. Sept. 7, 2023) (denying summary judgment on plaintiff's claims that I.Q. Data reported to a credit reporting agency debt that she did not owe and that she had disputed in writing). Under I.Q. Data's policy, accounts with written disputes submitted during the validation period must be "marked as disputed." ECF No. 56-3. This marking is required because the FDCPA mandates that a collection agency cease communication with a consumer who has disputed a debt in writing. *Id*.; 15 U.S.C. § 1692c(c). This evidence undermined Gamboa's claim that I.Q. Data did not "have the information" about the accounts with a written dispute of the debt. ECF No. 57-1, PageID.935.

In its response brief, I.Q. Data accused Nelson of demanding that it "perform a file-by-file review of 3,782 individual consumer accounts to identify who may have disputed its collection attempts in writing." ECF No. 57, PageID.930. But I.Q. Data did not dispute that its Debtor Work Cards were coded to show when consumers disputed the debt, and I.Q. Data included no evidence that an onerous file-by-file review would be necessary to generate a list of those consumers. *Id.*

In Interrogatory No. 7, Nelson asked I.Q. Data to identify the class members who "made a payment in an amount above the principal amount" and "state the total amount of payments on interest made." ECF No. 56, p.

18

12.  I.Q. Data objected to being asked to create a class list but, "[s]ubject to and without waiving said objection," stated that the "total amount of interest paid by such persons is $23,952.55." *Id*. (citing ECF No. 42-5, PageID.485-486).  Nelson asserted in its motion, "Since IQ can identify the amount the putative subclass members paid from its Electronically Stored Information, it likely follows that IQ too can provide the number of such persons, their names and addresses, in an Excel spreadsheet separate from the putative class list it provided." *Id*.  I.Q. Data's response brief offered no rebuttal to Nelson's argument that it could provide the information requested in Interrogatory No. 7.

But referring to both Interrogatory Nos. 6 and 7, I.Q. Data stated in its response brief that it complied with the Court's July 16 order that required it to "provide the names and addresses of the putative class members."  ECF No. 57, PageID.930-931; ECF No. 53, PageID.869.  It is true that Nelson's June 2024 supplemental brief did not highlight Interrogatory Nos. 6 and 7 in her long list of deficiencies.  ECF No. 50.  Thus, the July 2024 order did not specify that I.Q. Data had to identify the putative subclass members as requested in those interrogatories.  ECF No. 53.  But as detailed above, in the days before and after the July 16 hearing, Warner notified Gamboa that the amended response to Interrogatory No. 6 was non-responsive.  ECF

19

No. 58-2, PageID.959-961. And Interrogatory No. 6 was a central point of discussions during the August and September status conferences during which the Court had emphasized that I.Q. Data had waived its objections to fully answering Nelson's discovery requests.

Nelson noted that Federal Rule of Civil Procedure 23(c) permits classes to be "divided into subclasses that are each treated as a class under this rule," and she argued that interpreting the July 16 order in a way that permits I.Q. Data to avoid identifying subclass members would be illogical. ECF No. 58, pp. 4-5. Nelson argued, "IQ is attempting to avoid the certification of a subclass of persons whom have actual monetary damages proximately caused by I.Q. by not providing the number of, and the names and addresses of the identifiable putative subclass members." ECF No. 56, pp. 6-7. This argument has merit.

And while the July 16 order addressed specific discovery deficiencies that Nelson had raised in her June 2024 supplemental brief, that order overrode neither the April 10 order requiring I.Q. Data to "provide complete responses to plaintiff's discovery requests" nor the June 12 order emphasizing that I.Q. Data's "objections to fully answer[ing] the discovery requests are **WAIVED**." ECF No. 37, PageID.382; *Nelson*, 2024 WL 2963790 at *1 (emphasis in original).

Turning to I.Q. Data's failure to answer discovery about its net worth, Nelson noted in her supplemental brief that "[t]his Court has been very clear with IQ that all objections to it responding to Ms. Nelson's Interrogatories and requests to produce documents have been waived and furthermore it is too late for IQ to seek any type of protective order for the documents it has been required to produce." ECF No. 56, pp. 13-14 (citing ECF No. 53, PageID.868). And Nelson pointed out that, on top of the statutory maximum of "the lesser of $500,000 or 1 per centum of the net worth of the debt collector," each named plaintiff may recover "any actual damages sustained by such person." 15 U.S.C. § 1692k(a). I.Q. Data contended in its response brief that it was "more than passing strange" that Nelson continued to seek discovery about its net worth after it offered to stipulate to the statutory maximum of $500,000 in damage. ECF No. 57, PageID.931-932. But I.Q. Data provided no legal analysis disputing Nelson's assertion that § 1692k(a) permits the recovery of actual damages on top of the maximum statutory damages. And as Nelson argued, I.Q. Data did not "cite any case law that would permit a party, under a court order, to unilaterally attempt to circumvent an order by offering a stipulation to something else." ECF No. 58, p. 6. The Court agrees.

21

Four days before the scheduled October 25 hearing, the parties jointly moved to stay the hearing so that they could participate "in voluntary facilitative mediation." ECF No. 59, PageID.966. The Court granted the stay and rescheduled the hearing for December 12, 2024. ECF No. 60; ECF No. 61. But when the Court inquired by email on December 9, 2024 about whether the hearing would go forward, Warner sent a response stating, "Yes, we need to move forward with the motion as Counsel for IQ did not provide any dates in which his client would be available to proceed to mediation." Three minutes after Warner sent his email, Gamboa emailed him detailing two facilitators' available dates, with most not being until March and April 2025.

> That said, I went ahead and grabbed Judge Holderman and Anderson's availability for a settlement conference. We had some decision makers out for the holiday, so I will follow back up with them to see if these dates work for them:
>
> Neutral: Hon. Wayne R. Andersen (Ret.)
> February: Unavailable
> March: 25, 27
> April: 1, 3, 8, 10, 22, 24, 29
> *Currently via ZOOM Only
>
> Neutral: Hon. James F. Holderman (Ret.)
> February: 20
> March: 4, 6, 11, 13, 18, 20, 25, 27
> April: 1, 3, 8, 15, 17, 22, 24
> *Currently via ZOOM Only
>
> I think I just saw you respond to Judge Stafford's clerk, but I am around if you wanted to discuss any of the above.
>
> - Paul

22

At the December 12 hearing, Warner reported that, in October 2024, he forwarded a list of neutrals from JAMS in Chicago, including Judges Andersen and Holderman, but that Gamboa made no response until his December 9th email.  ECF No. 62, PageID.983-984.  Gamboa did not appear at the hearing; Wolf said that Gamboa was at a deposition that a judge had ordered to continue into that day.  *Id*., PageID.985.  Addressing the delay in seeking dates for mediation, Wolf claimed that I.Q. Data was waiting on an order in a state case to determine the settlement value of this case.  *Id*., PageID.986-987.  As of the hearing, I.Q. Data had given no authority for settlement "other than a nuisance value sort of thing."  *Id*., PageID.987.  But I.Q. Data had to know that Nelson did not view this as a nuisance case, and Warner reported that Judge Andersen charged $25,000.  *Id*., PageID.1006.  I.Q. Data's belief that this case has only nuisance value is incongruent with its representation that it intended to engage in expensive facilitative mediation.  So I.Q. Data had no realistic expectation that the parties could have a meaningful settlement discussion, and the Court finds that I.Q. Data's push to adjourn the hearing was "a mere stalling tactic."  *Id*., PageID.987-991.

The rest of the December 12th hearing cast more doubt on the credibility of I.Q. Data's counsel.  First, Wolf said that I.Q. Data regarded

23

the issue about its net-worth discovery "as moot" because it offered to "streamline all of this" and stipulate to the $500,000 statutory maximum. *Id.*, PageID.995-996.  The Court agreed that "maybe we wouldn't be here if there was a stipulation."  *Id.*, PageID.994-995.  But I.Q. Data had *not* secured a stipulation, and the Court saw no evidence that I.Q. Data put in effort to lock down an agreement.  Indeed, Wolf made the perplexing suggestion during the hearing that the ball was in Warner's court to secure the stipulation that I.Q. Data sought: "Your Honor, we've never received a stipulation from Mr. Warner to that end."  ECF No. 62, PageID.994-995. And because the July 16 order required I.Q. Data to provide the "discovery about its net worth" by August 30, 2024, ECF No. 53, PageID.869, the Court found Wolf's claim that the net-worth issue was moot "one of the craziest things I've ever heard an attorney say on the record," ECF No. 62, PageID.996.

Wolf also said that there is no subclass and that the $500,000 statutory maximum applied equally to all class members.  *Id.*  But he offered only evasions in response to Warner's argument that class members who paid interest or expenses disputing the debts may be entitled to a refund on top of statutory damages under § 1692k(a).  *Id.*, PageID.997-1000.

24

Turning to Interrogatory No. 6, Wolf argued, "[W]e have already answered in discovery…we have no records of anyone who disputed the debt." ECF No. 62, PageID.1000.  That was false.  As the Court noted in response, I.Q. Data's nonresponsive answer to Interrogatory No. 6 was that no one had objected to its right to collect interest.  *Id*.  The Court then asked Wolf, "Have you identified in response to [the] interrogatory the subclass members who disputed the debt in writing."  *Id.*, PageID.1000-1001.  Wolf responded that it was his understanding that "we cannot do that."  *Id*.  Pressed for clarification, he said, "We cannot reproduce any records to the extent they exist."  *Id.*, PageID.1001.  But in response to more questions, Wolf equivocated on his claim that I.Q. Data could not identify the subclass members who disputed the debt:

> **THE COURT**: I'm asking you as an officer of the court who has a duty of candor, I.Q. Data cannot identify consumers who dispute their debt in writing?
>
> **MR. WOLF**: I believe that's the case, your Honor.  That's true, yes.
>
> **THE COURT**: So what happens?  What is the procedure if a consumer sends in a written dispute of the debt?
>
> **MR. WOLF**: Your Honor, as I sit here today, I cannot answer the question.  I don't know the entire process….  The only way to look and see whether such information would exist would be to go through each one of the files on a file-by-file review….

25

**THE COURT**: Okay.  So for clarification, you're saying that I.Q. has refused to comply with the order because it thinks that it's just too much work to look at the individual files?

**MR. WOLF**: Your Honor, I have to look back at the order.

....

**THE COURT**:….  Is it true that you're saying that you could determine who disputed the debt in writing by looking file by file?....

**MR. WOLF**: We may be able to do so.  Any information, to the extent that it exists, should be there.

**THE COURT**: And so what you're saying is that I.Q. has declined to do the file-by-file review.

*Id.*, PageID.1002-1003.

Wolf then suggested that the Court had agreed at the August 21 status conference that I.Q. Data need not conduct a file-by-file review and could instead depose an I.Q. Data witness.  *Id.*, PageID.1003.  But the Court meant only that I.Q. Data's witness could testify about how its files are kept and how it could search those files to identify subclass members. Because I.Q. Data had still provided no answers to those questions, the Court asked Wolf, "[H]ow are the files kept?"  *Id.*, PageID.1004.  Wolf responded, "In paper."  *Id.*  He continued that I.Q. Data was able to produce some spreadsheets with "certain pieces of information, but my understanding is that the entirety of the file is kept in a paper format in

various locations, some of which are in, you know, like, an off-site storage."
*Id.* The Court found incredible I.Q. Data's claim that it kept only paper files.
"The name of the company is I.Q. Data International, but they don't keep
data in computerized form, they use paper? It just really strains credulity."
*Id.*, PageID.1005.

Wolf's claim that I.Q. Data keeps only paper files is not only
incredible, but also refuted by the computerized Print Data Work Card for
Nelson that I.Q. Data produced. ECF No. 56-2, PageID.896. The Court's
notes also show that Gamboa stated at the August 21 status conference
that each consumer's account is electronic and may include PDF
attachments of letters and emails.

Nelson's motion requests as relief that the Court compel I.Q. Data to
fully and substantively respond to Interrogatory Nos. 6, 7, and 14, as well
as RFPs 12-14; to strike I.Q. Data's answer; to direct the Clerk of Court to
enter a default, with a recommendation to enter a default judgment after a
class has been certified. ECF No. 56, p. 18. As an alternative to the Court
compelling I.Q. Data to respond to the discovery requests about its net
worth, Nelson asks the Court to prohibit I.Q. Data from making any
argument that 1% of its net worth is anything less than $500,000, the

maximum statutory amount that can be awarded to the class under § 1692d(a)(2)(B). *Id.*, p. 2.

Nelson's motion to compel and for sanctions should be granted. Under Rule 37(b)(2)(A)(iii) and (vi), I.Q. Data's answer should be stricken and a default should be entered. If a class is certified, damages can then be assessed for entry of a default judgment. Rule 37(b)(2)(A)(vi). I.Q. Data should be compelled to answer Interrogatory Nos. 6 and 7 with the threat of an order of contempt under Rule 37(b)(2)(A)(vii) if it fails to comply. And I.Q. Data should be ordered to either (1) submit a proposed order stipulating not to dispute that 1% of its net worth is $500,000 or more, or (2) fully answer the discovery requests about its net worth. Failure to do at least one of those options should be treated as contempt of court under Rule 37(b)(2)(A)(vii). Finally, I.Q. Data and its attorneys should be ordered to pay Nelson attorney's fees and costs under Rule 37(b)(2)(C).

## I. ANALYSIS

A district court may enter dispositive sanctions to remedy discovery abuses. *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 801 F. App'x 928, 933 (6th Cir. 2020) (citing Rule 37(b)(2)(A)(vi)).

Courts consider four factors in this analysis:

1) whether the disobedient party acted in willful bad faith;

2) whether the opposing party suffered prejudice;

3) whether the court warned the disobedient party that failure to cooperate could result in a default judgment; and

4) whether less drastic sanctions were imposed or considered.

*Id.* at 934. Although no one factor is dispositive, bad faith is the preeminent consideration. *Id.; United States v. Reyes*, 307 F.3d 451,458 (6th Cir. 2002); *Schafer v. City of Defiance Police Dept.*, 529 F.3d 731, 737 (6th Cir. 2008). Dispositive relief is proper against a party who has engaged in contumacious conduct, perverse resistance of authority, or stubborn disobedience. *Id.*

Entry of default judgment is a drastic measure, but the district court does not abuse its discretion in entering a default judgment to punish a party for "egregious conduct and to deter other litigants who might be tempted to make a mockery of the discovery process." *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x 372, 378 (6th Cir. 2008). Default judgment as a sanction for discovery abuse is warranted when "no alternate sanction would protect the integrity of the pre-trial proceedings." *Buck v. U.S. Dept. of Agric., Farmers Home Admin.*, 960 F.2d 603, 608 (6th Cir. 1992); *see also State Farm Mut., Auto. Ins. Co. v. Max Rehab Physical Therapy, LLC*, No. CV 18-13257, 2021 WL 2843832 (E.D. Mich. June 28, 2021), *adopted*, No. CV 18-13257, 2021 WL 3930133 (E.D. Mich. Sept. 2, 2021)

29

(recommending default judgment after warnings and lesser sanctions failed to spur compliance with discovery orders).

Applying the factors described in *KCI*, the Court finds that Nelson's motion should be granted.

**A.**

As noted, the most important consideration is whether I.Q. Data "acted in willful bad faith." *KCI*, 801 F. App'x at 934. Courts find willful bad faith when the party "display[s] either an intent to thwart judicial proceedings or a reckless disregard for the effect of his conduct on those proceedings." *Schafer*, 529 F.3d at 737. Here, as detailed above, I.Q. Data repeatedly disregarded court orders for it to fully answer discovery, going so far as to declare moot an order requiring it to provide discovery about its net worth. After pronouncing early on that it would resist full-blown discovery until the Court decided its motion for judgment on the pleadings about its right to charge interest, I.Q. Data engaged in myriad delay tactics and evasions, none of which were permitted by the discovery rules.

I.Q. Data could have moved to stay discovery or for a protective order pending the decision on its motion for judgment on the pleadings, filed in April 2024. ECF No. 36. Perhaps I.Q. Data made such a request at the

30

June 18 hearing on the motion for judgment on the pleadings before Judge Behm. But her minute entry indicating that she would decide I.Q. Data's motion after an order on the discovery disputes should have corrected I.Q. Data's misbelief that it could evade full-blown discovery pending a decision on its dispositive motion.

Had I.Q. Data made timely and proper objections to Nelson's discovery requests along with a privilege log and a negotiated protective order, the parties and the Court could have worked to achieve proportional discovery, as encouraged by Federal Rule of Civil Procedure 1. That rule states that the procedural rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Rule 1. The 2015 amendments to the Federal Rules of Civil Procedures were meant "to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay." Rule 1, Advisory Committee Notes (2015).

But rather than using the tools provided in the rules of discovery to achieve the aims of proportional discovery and protection of sensitive information, I.Q. Data engaged in discovery abuses that deprived Nelson of relevant evidence, forcing her "to waste significant time and money dealing with the [I.Q. Data's] abuses." *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x

31

372, 376 (6th Cir. 2008).  And by forcing the Court to devote months to addressing I.Q. Data's "discovery abuses over and over again," it engaged "a wanton waste of judicial resources."  *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 99 (D.N.J. 2006).

I.Q. Data also provided shifting explanations for why it would not answer interrogatories about the subclasses, falsely claiming that it did not have or could not provide the identities of consumers who disputed their debt in writing, and that it maintained mostly paper files.  And as a delay tactic, I.Q. Data pretended to be willing to engage in expensive facilitative mediation, knowing that it valued the case too low for meaningful settlement discussions.  From start to finish, I.Q. Data chose gamesmanship over cooperative and proper discovery.  Imposing dispositive sanctions here is appropriate to "deter other litigants who might be tempted to make a mockery of the discovery process."  *Grange Mut. Cas. Co.*, 270 F. App'x at 378.

## B.

The prejudice factor supports imposing dispositive sanctions.  "A party is prejudiced when it is unable to secure the information requested and required to waste time, money, and effort in pursuit of cooperation which the opposing party was legally obligated to provide."  *Barron v. Univ.*

*of Mich.*, 613 F. App'x 480, 485 (6th Cir. 2015) (cleaned up).  Nelson has been prejudiced by having to seek court assistance to get I.Q. Data to answer a single question or produce a single document.  Recall that I.Q. Data objected to every discovery request.  Warner steadfastly sought I.Q. Data's cooperation to get proper discovery responses, but Gamboa repeatedly waited until the eve of a status conference or a hearing to bother responding to Warner's inquiries.  And though the Court has ordered I.Q. Data to fully respond to discovery many times, it has still withheld discovery necessary for Nelson to identify its putative subclass.  "It is in cases like this one, where the obstruction prevented the other party from accessing evidence needed to bring the case, that default is most likely to be the appropriate sanction." *Grange Mut. Cas. Co.*, 270 F. App'x at 378; *see also KCI*, 801 F. App'x at 935.

### C.

The third factor addresses whether the Court warned defendants that their failure to cooperate could lead to a default judgment.  Although an earlier warning is relevant, it is not required when there is evidence of bad faith or contumacious conduct. *Harmon v. CSX Transp., Inc.,* 110 F.3d 364, 368 (6th Cir. 1997); *Annabel v. Erichsen*, No. 15-10345, 2019 WL 2218766, at *5 (E.D. Mich. Mar. 15, 2019).  For the reasons stated, the

Court finds that I.Q. Data engaged in bad faith and contumacious conduct. And as detailed above, the Court *did* warn I.Q. Data during status conferences and in orders that its further violations of discovery rules or orders would result in more severe sanctions, up to the entry of a default judgment. ECF No. 48, PageID.542; ECF No. 53, PageID.870. "Notice is satisfied." *KCI*, 801 F. App'x at 936.

## D.

The last factor—whether lesser sanctions have been imposed or considered—supports sanctioning I.Q. Data with a default. The Court may impose dispositive relief as a "first and only sanction," and it need not "incant a litany of the available lesser sanctions." *Harmon*, 110 F.3d at 368. But here, the Court imposed monetary sanctions and ordered that I.Q. Data "may not without leave of court and for good cause shown rely on any other documentary evidence beyond Bates No. 107." ECF No. 53, PageID.869. The Court engaged in exhaustive efforts to spur I.Q. Data to cure the deficiencies in its discovery responses, but I.Q. Data has been stubbornly resistant. Enough is enough. Dispositive relief is the only sanction that "would protect the integrity of the pre-trial proceedings." *Buck,* 960 F.2d at 608.

## II. CONCLUSION

34

The Court **RECOMMENDS** that Nelson's motion to compel and for sanctions be **GRANTED**.  ECF No. 56.  Specifically:

1. I.Q. Data's answer should be stricken and a default should be entered.  If a class is certified, damages can then be assessed for entry of a default judgment.

2. I.Q. Data should be compelled to answer Interrogatory Nos. 6 and 7 with the threat of and order of contempt.

3. I.Q. Data should be ordered to either (1) submit a proposed order stipulating not to dispute that its 1% of its net worth is $500,000 or more, or (2) fully answer the discovery requests about its net worth.  Failure to do at least one of those options should be treated as contempt of court.

4. And I.Q. Data and its attorneys should be ordered to pay Nelson's attorney's fees and costs.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: January 28, 2025

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). If a party fails to timely file specific objections, any further appeal is waived. *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains. Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation. If the Court determines that any objections lack merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

36

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System to their email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 28, 2025.

<u>s/Davon Allen</u>
DAVON ALLEN
Case Manager