IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Faith Stekly, | ) | Case No. 0:25-cv-00216-ECT-DLM |
| | ) | |
| Plaintiff, | ) | |
| | ) | **IQ DATA INTERNATIONAL** |
| vs. | ) | **INC.'S MEMORANDUM OF LAW** |
| | ) | **IN OPPOSITION TO PLAINTIFF'S** |
| IQ Data International, Inc. and | ) | **MOTION TO COMPEL** |
| Liberty Mutual Insurance Company, | ) | |
| | ) | |
| Defendants. | ) | |

IQ Data International, Inc. ("Defendant" or "IQ Data"), submits this memorandum of law in opposition to Plaintiff's Motion to Compel and states as follows:

## I.    INTRODUCTION – Procedural History and Discovery Produced

On January 17, 2025, Plaintiff filed her Complaint against IQ Data alleging violations of the FDCPA Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, in Count I and Fraud in Count II. (ECF. No. 1). Plaintiff later amended her Complaint on February 27, 2025 and then again on May 22, 2025. (ECF. Nos. 9, 54). Notably, Plaintiff's claimed FDCPA violations are based on the allegations that IQ Data: (1) called Plaintiff's mother; (2) called Plaintiff's employer after she asked IQ Data to stop; (3) made misrepresentations to her employer and left a message with her supervisor; (4) improperly attempted to collect 6% interest; (5) reported false information; and (6) sent a letter to Plaintiff after she asked for all communications to stop. (ECF. No. 54). The alleged violations of the Act occurred in February of 2024, March of 2024, and October of 2024. *Id.*, ¶¶27, 39-41, 52, 72, 79, 110.

1

Since the inception of this case, Plaintiff has filed the following: Answer to "Counterclaims;" Motion for Judgment on the Pleadings; Objection and Opposition to Admission of Paul Gamboa's and Krista Easom's Admission for Pro Hac Vice; Motion for Contempt; and Motion to Compel. (ECF. Nos. 17, 18, 31 60, 68). The Motion for Judgment on the Pleadings, filed on March 28, 2025 (or approximately two weeks after IQ Data filed its Answer), underscores that fact that this matter involves a straightforward application of the law and facts, as well as the fact that this is not a particularly complicated case warranting voluminous and expensive fact discovery.

Despite the simple and straightforward nature of this case, on March 29, 2025, Plaintiff served IQ Data with a whopping 71 Requests for Admission, 50 Interrogatories, and 47 Requests for Production. *See* Decl. Paul Gamboa, ECF 77, at ¶ 2. IQ Data timely served responses and objections to those written discovery requests on April 28, 2025. *Id.* In conjunction with those responses, IQ Data produced almost 300 pages of records, consisting of materials from its creditor-client, its written communications with Plaintiff, and all call recordings with Plaintiff. *Id*. at ¶ 3.

IQ Data's production included its confidential "Work Card." *Id*. at ¶ 4. Importantly, the Work Card logs every communication IQ Data while attempting to collect on Faith Stekly's account. *Id*. at ¶ 5; *see also* Decl. Michael Gulbranson, ECF 78, at ¶ 16. The Work Card also captures any reporting credit that IQ Data performed in connection with its collection efforts. *Id.*

On July 29, 2025, IQ Data supplemented its production with two policies: FDCPA Policy and Consumer Dispute Policy. *Id*. at ¶ 17. No depositions have been completed to date, and the discovery deadline is December 1, 2025. (ECF No. 38).

## II.   LEGAL STANDARD

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

Generally speaking, relevancy encompasses "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in this case." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978). While Rule 26 contemplates a liberal scope of discovery, this Court "possess[es] considerable discretion in determining the need for, and form of, discovery...." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 949 (D. Minn. 2015) (citations omitted).

Further, as set forth above, not only must information sought in discovery be relevant, it must also be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Proportionality—a discovery hallmark—must be considered when ruling on discovery disputes. *See Provident Savings Bank, F.S.B. v. Focus Bank*, 2020 WL 6196132, at *2

(E.D. Mo. Oct. 22, 2020) ("The parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." (quoting the Advisory Committee's notes to the 2015 amendment)).

"In determining proportionality, courts consider numerous factors, including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, and importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Beseke v. Equifax Info. Servs., LLC*, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018). To this end, a court upon a motion or on its own "must" limit discovery, when the discovery is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive," if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action," or if the discovery is simply outside of the scope of Rule 26(b)(1). *See* Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

It bears stressing that courts generally disfavor increasing litigation costs in potentially unnecessary litigation. *See Kasso v. City of Minneapolis*, 2024 WL 4799848, at *5 (D. Minn. Nov. 15, 2024) (granting the defendant's motion to stay discovery pending the final determination on the plaintiff's motion for judgment on the pleadings).

Furthermore, Rule 26 anticipates that in certain cases, discovery of trade secrets should either be limited or not permitted at all. *In re Remington Arms Co.*, 952 F.2d 1029, 1032 (8th Cir.1991). It provides, in part, that "for good cause shown, the court ... may make any order which justice requires to protect a party or person from annoyance,

4

embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]" Fed. R .Civ. P. 26(c)(7). In recognition of the friction between the protection afforded to trade secrets, and the right to access relevant discovery, the Eighth Circuit has therefore formulated the following burden-shifting test: (1) the party opposing discovery must first demonstrate that the information at issue is a trade secret under Rule 26(c)(1)(G) and that its disclosure would be harmful to the party's interest in the property; (2) the burden then shifts to the requesting party to show that the information is relevant to the lawsuit and is necessary to prepare the case for trial; and (3) if the requesting party demonstrates relevance and need, the court must weigh the injury that disclosure might cause against the moving party's need for the information. *See In re Remington Arms Co.*, 952 F.2d at 1032.

The federal Defend Trade Secrets Act broadly defines a trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes." 18 U.S.C. § 1839. To qualify as a trade secret under the Defend Trade Secrets Act, the information must meet two criteria: (1) the owner must have taken reasonable measures to keep the information secret, and (2) the information must derive independent economic value from not being generally known or readily ascertainable through proper means by others who could obtain economic value from its disclosure or use. *Id*.

5

## III.    ARGUMENT

At issue are IQ Data's Responses to Requests for Production 3, 5, 11, 13-14, 19, 22, 25, 31-32, 34, 37, 40, 43, 47, and IQ Data's Answers to Interrogatories 2- 5, 8- 19, 20, 21-26, 28-50. *See* ECF 71-1. These disputed requests can generally be broken down into three main categories:

A.    Requests where, when one considers the proportional needs of this straightforward, low stakes case, IQ Data has already produced all relevant information (*see* RFP 3, 19, 25, 32, 34, 37, 40, 43, 47; Interrogatories 2, 10-11, 13-16, 19, 21, 24-26, 28-31, 32, 36-38, 40-43, 45, 46, 48-49, 50)

B.    Broad demands for the identification and production of previous complaints and claims made against IQ Data (*see* RFP 5, RFP 14, RFP 31; Interrogatory 47)

C.    Broad demands for the identification and production of IQ Data's proprietary and confidential training materials, internal systems, software, and data, as well as its contracts with its creditor-client (RFP 11, 13, 22; Interrogatory 4, 9, 33 44)

IQ Data avers its objections raised in response to these requests are entirely proper and it stands on them, praying that the Court deny Plaintiff's motion to compel for the following reasons.

**A.** **Requests for which IQ Data has already produced all relevant information (RFP 3, 19, 25, 32, 34, 37, 40, 43, 47; Interrogatories 2, 3, 5, 10-16, 19, 21, 13-26, 28-31, 32, 36-38, 40-43, 45, 46, 48-49, 50)**

As noted above, IQ Data has produced its "Work Card" bates stamped as IQD0001-0004. The Work Card captures every communication IQ Data had with any person while working on collecting the account, including credit reporting agencies. *See* ECF 78 (Gulbranson Dec.), ¶¶ 16; 27-28. All communications that IQ Data receives from the credit reporting agencies are added to the "Work Card," and if IQ Data receives documents from a credit reporting agency, those documents are added to the file. *Id.,* at ¶¶ 27-28.

As for insurance information, IQ Data produced the declaration page of its insurance policy,[1] which evidences there is more than enough coverage to satisfy any judgment Plaintiff by be awarded in this case. Any more information on IQ Data's insurance policy is not relevant or proportional to the needs of the case.

With respect to the requests for internal policies and procedures that may support its defenses, IQ Data supplemented its production to produce its FDCPA Policy and Dispute Policy. *See* ECF 77 (Gamboa Dec.), ¶ 14. Additionally, Plaintiff requests IQ Data provide "policies and procedures" governing the collection of interest and all the facts IQ data relied on in charging interest. RFP No. 23-24. As stated in IQ Data's Response in Opposition to Plaintiff's Motion for Judgment on the Pleadings as well as in its response to Plaintiff's meet-and-confer letter, IQ Data interprets the law, charges

---

[1] *See* ECF 78 (Gulbranson Dec.), ¶ 17.

interest allowable by law (here, Minn. Stat. § 334.01), and by contract. *See* ECF No. 71-1, pgs. 29-32; 66-68. IQ Data further cited to the documents it received from its client that demonstrate the balance and interest are owed. *Id.*

With respect to any requests for documents and information from the original creditor, Lexi Apartments, IQ Data produced all documents that are responsive to the request. *See* ECF 78 (Gulbranson Dec.), ¶ 17.

Lastly, with respect to those interrogatories requesting names of persons who have knowledge regarding the lawsuit, IQ Data has already provided the names of three IQ Data employees who worked on the account and confirmed that it would facilitate any necessary depositions. *See* ECF 77 (Gamboa Dec.), ¶ 11. The home address, home phone number, and age of IQ Data employees are not relevant to Plaintiff's claims.

**B.      Broad categories of non-related consumer or administrative complaints (RFP 5, RFP 14, 31; Interrogatory 47)**

There are several issues with Plaintiff's requests for all prior complaints involving IQ Data. *First*, most of the information requested in this Interrogatory and Requests for Production are public record and are equally available to Plaintiff if her counsel deems them necessary for the prosecution of her claim. Plaintiff could obtain any prior lawsuits from searches of public dockets, and can secure administrative complaints filed against IQ Data from public databases or otherwise utilizing record requests.

*Second*, the information demanded in these requests is wholly irrelevant as to whether IQ Data violated the FDCPA while attempting to collect a debt from Plaintiff. Plaintiff's claims that prior complaints against IQ Data are relevant to Plaintiff's claim

for punitive damages. However, punitive damages are not available for a violation of the FDCPA. *See Mendes v. JH Portfolio Debt Equities*, 2019 WL 4860660, at *2-3 (E.D. Mo. Oct. 2, 2019) (noting that § 1692k does not provide for punitive damages); *Keeton v. Countrywide Home Loans, Inc.*, 217 F. Supp. 3d 177, 181 (D.D.C. 2016) ("The FDCPA provides that private parties are limited to actions for any actual damages sustained by such person as a result of a debt collector's failure to comply with the Act, such additional damages as the court may allow, but not exceeding $1,000, and costs and reasonable attorney fees."); *Desmond v. Phillips & Cohen Assocs., Ltd.*, 724 F. Supp. 2d 562, 563 n.1 (W.D. Pa. 2010) ("Punitive damages are not available under the FDCPA.").

Relatedly, alleged prior acts by IQ Data as to people other than Plaintiff is not a factor in the amount of damages available to a plaintiff in this FDCPA individual action. Federal courts consider "frequency and persistence of noncompliance by the debt collector" to be limited to the case at hand, and the Act refers only to the frequency and persistence of a defendant's non-compliance as to the specific plaintiff, not as to other non-parties in the past. *See Donnelly v. NCO Fin. Sys., Inc.*, 263 F.R.D. 500, 506 (N.D. Ill. 2009) (holding that there is nothing in the clear language of the FDCPA which suggests that a court looks to a debt collector's practices regarding persons other than the plaintiff in determining the frequency and persistence of noncompliance); *Dewey v. Assoc. Collectors, Inc.*, 927 F. Supp. 1172, 1175-76 (W.D. Wis. 1996) (explaining that frequency and persistence of noncompliance does not pertain to actions taken by a debt collector in other cases but only to the consistency of the debt collector's actions with respect to the debtor bringing suit).

The court in *Dewey* aptly explained its reasoning as follows:

Plaintiffs maintain that the "frequency and persistence of noncompliance" language in § 1692k(b)(1) and (2) pertains to defendant's actions in cases other than this one and seeks to discover and prove that defendant has violated the act with respect to other consumers. Proper interpretation of the statute does not lead to this conclusion.

… I find that "frequency and persistence of noncompliance" does not pertain to actions taken by a debt collector in other cases but only to the consistency of the debt collector's actions with respect to the debtor bringing suit.

*Dewey*, 927 F. Supp. at 1175. Thus, Plaintiff's demands that IQ Data identify every lawsuit, complaint, or claim are irrelevant.

Plaintiff's position here further ignores that prior complaints or claims made by are not evidence of any wrongdoing here. In fact, such "evidence" is inadmissible under Rule 404 of the Federal Rules of Evidence when offered to demonstrate that prior lawsuits or claims are evidence of the validity of the Plaintiffs' current claims. Pursuant to Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid.404(b). Rule 404 therefore precludes Plaintiff from introducing past complaints or claims made or orders entered against IQ Data as a means to establish that Defendant violated the FDCPA in this case.

*Finally*, IQ Data does not maintain a centralized, easily searchable database where all the complaints it has ever received are stored and maintained. *See* ECF

78 (Gulbranson Dec.), ¶¶ 20-23; 25. Producing this information would be unduly burdensome and is not proportional to the needs of this case. *Id.,* at ¶¶ 24; 25.

C.      **Broad demands for training materials, internal systems, software, and data (RFP 11, 13; Interrogatory 4, 9, 17-18, 44) and client contracts (RFP 22, Interrogatory 33)**

Demands for the production of training materials and requests for information related to IQ Data's software systems are not relevant because they do not shed any light on the question of whether IQ Data violated the FDCPA by contacting Plaintiff or by calling her employer. The FDCPA is a strict liability statute and any information regarding training is irrelevant as to whether IQ Data violated the statute here. *See Gillen v. Kohn L. Firm S.C.*, 2014 WL 3784488, at *2 (W.D. Wis. July 31, 2014) (ruling that the defendant should not be made to produce training materials or documents related to maintenance of FDCPA compliance procedures); *Sanchez v. Cardon Healthcare Network, LLC*, 2013 WL 2352142, at *2 (M.D. Fla. May 29, 2013) (finding that compliance or noncompliance with its own policies and procedures does not have any relevancy to the plaintiff's FDCPA claim). Stated simply, this straightforward case is about whether IQ Data violated the FDCPA and is liable for fraud for calling Plaintiff's employer, charging interest, and sending collection letters to Plaintiff.

Further, IQ Data has taken reasonable measures to keep its practices, training, systems, pricing, and contract terms a secret to maintain a competitive advance in the debt collection market. *See* ECF 78 (Gulbranson Dec.), ¶¶ 30-51. If IQ Data's competitors were able to secure this information, which is not generally known to the public and is certainly not to its competition, IQ Data could very easily lose clients and

business. *Id.,* at ¶51. For this additional reason, requests to compel detailed information regarding its internal training, policies, software, and contracts should be denied.

**D.      Citing to documents in response to Interrogatories is permissible**

In response to several Interrogatories, IQ Data cited to Bates stamped documents that were produced, which is expressly provided-for by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 33(d)(1) (permitting a party to answer interrogatories by "specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could" when "the answer to [the] interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records ... and ... burden of deriving or ascertaining the answer will be substantially the same for either party"). Here, Plaintiff can extract the information she is seeking from documents cited in IQ Data's production, which was very clearly labeled and separated in the following ways:

- Work Card – IQD000001-000004

- Letters and Disputes– IQD000005-000012

- Landlord/Creditor Documents – IQD000013-000286

- Call Recordings – IQD000287, IQD000288, IQD000289

- Insurance Declaration Page - IQD000290

- FDCPA Dispute Policy - IQD000291- IQD000306

- Consumer Dispute Policy - IQD000307- IQD000310

As such, there is no need or justification for IQ Data to have to supplement its Interrogatory Responses a third time.

12

**E.      Plaintiff's requests for attorneys' fees should be denied**

Plaintiff is not entitled to attorney's fees when there is a good faith discovery dispute. *See Jackson v. Minnesota Dep't of Hum. Servs.*, 2022 WL 1261690, at *11 (D. Minn. Apr. 28, 2022) (granting the plaintiff's motion to compel in part, and finding that each party should be responsible for its own costs and attorneys' fees). As noted throughout, IQ Data has complied with its discovery obligations, has made objections in good faith, and avers that Plaintiff's motion should be denied in its entirety.

**IV.    CONCLUSION**

WHEREFORE, IQ Data prays that Plaintiff's Motion to Compel be denied in its entirety, and for any other relief that the Court deems just and proper.

DATED: July 29, 2025                    Respectfully Submitted,

**GORDON REES SCULLY**
**MANSUKHANI, LLP**

By: */s/ Paul Gamboa*
         Suzanne L. Jones, MN Bar No. 389345
         Leah J. Christenson, MN Bar No. 0504664
         Paul Gamboa, *admitted pro hac vice*
         80 S. 8TH Street, Suite 3850
         Minneapolis, MN 55402
         Tel. (612) 351-5969
         sljones@grsm.com
         lchristenson@grsm.com
         pgamboa@grsm.com
         *Attorneys for Defendant*

13